Opinion issued April 26, 2012



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-11-00115-CR

———————————

Ronald ANTHONY Booker, Appellant

V.

The State of
Texas, Appellee



 



 

On Appeal from the 339th District Court

Harris County, Texas



Trial Court Case No. 1171834

 



 

MEMORANDUM OPINION

          After
appellant, Ronald Anthony Booker, entered a plea of guilty before a jury, the
jury convicted him of the first degree felony offense of murder.[1]  The trial court assessed punishment at thirty
years’ confinement.  In one issue,
appellant contends that his sentence is disproportionate to the offense and,
therefore, constitutes cruel and unusual punishment.

          We
affirm.

Background

Before opening statements, appellant
pleaded guilty to the offense of murder. 
The jury subsequently convicted him based solely on this plea, and he
elected to have the trial court assess punishment.  The only testimony thus occurred during the
punishment phase.

On June 13, 2008, thirteen-year-old
Alexandra Nicks, a resident of the Southmore Gardens
apartment complex in south Houston, had an argument with forty-three-year-old Raymond
Ford, the complainant, in a courtyard of the complex.  During the argument, Nicks and Ford both yelled
at each other, and Ford “got up in [Nicks’] face,” but he did not physically touch
her, and he did not have a weapon during the argument.  Eventually, this argument ended, and Nicks later
apologized to Ford.

Later that evening, Nicks saw Ford
arguing with appellant, who did not live at Southmore
Gardens, in front of Ford’s apartment.  Nicks
could not determine what the men were arguing about, but she did see that Ford
was holding a “little machete” at his side. 
Nicks testified that Ford was only holding the machete and that he was not
making any threats with it.  She could
not see if appellant was holding a weapon during this argument.  She stated that she believed Ford had been
drinking, but he did not look like he was about to hurt appellant or anyone else
present.  Nicks saw appellant leave the
apartment complex after this argument concluded.  Approximately an hour and a half later, while
she was in her apartment, she heard gunshots. 
She “waited a little while” and then walked over to Ford’s apartment.  Ford was still alive at this point, but he died
shortly thereafter.

Morgan Grandberry,
who also lived at Southmore Gardens at the time of
this incident, testified that several people were out in the courtyard drinking
and playing dominoes during Ford’s argument with Nicks.  She agreed that this argument was entirely
verbal and that no physical contact occurred. 
Grandberry testified that, during the argument
with Nicks, Ford briefly went inside his apartment and then returned holding a
machete.  She stated that he did not make
any threats with the machete; instead, he just held it and announced to the
courtyard that he could protect himself. 
She agreed that Ford had had “a little bit too much to drink.”  Grandberry testified
that she did not feel threatened by Ford. 
She also testified that she did not witness an altercation between Ford
and appellant that evening.

After Ford’s argument with Nicks
concluded, appellant walked through the gate into the complex, stood behind Grandberry, who was seated at a table in the courtyard, and
cocked a pistol.  At this point, Grandberry left the courtyard and returned to her
apartment.  She later went back to the
courtyard to clean up the table, and no one else was outside.  She then saw appellant walk back through the
gate into the complex and towards Ford’s apartment.  She again returned to her apartment, and as
soon as she shut her front door, she heard gunshots.  She went to Ford’s apartment, and she saw him
lying on the floor with multiple gunshot wounds.

San Antonio Ford, Raymond Ford’s
brother, testified that Ford used a cane and, occasionally, a scooter to get
around his apartment because he had difficulty walking as a result of knee
trouble.  He characterized Ford’s movements
as “very slow.”

George “Donnell” Keller testified
that appellant lived with him at a nearby address and that they were hanging
out with other friends and playing video games at Southmore
Gardens on the night of Ford’s murder. 
Keller could hear the altercation between Ford and Nicks from inside his
friend’s apartment, but he did not go outside to investigate.  According to Keller, appellant was outside in
the courtyard during this incident. 
Later, appellant went into the apartment and told Keller about both
Ford’s altercation with Nicks and an altercation that he had subsequently had
with Ford.  Appellant told Keller that he
had “gotten into it” with Ford and that Ford had “pulled a knife on him.”  Appellant, Keller, and two other friends then
drove from Southmore Gardens to Keller’s house.  Approximately thirty minutes later, the group
drove back to Southmore Gardens, and Keller stated
that appellant appeared “upset” during this drive.

When they arrived back at Southmore Gardens, appellant told Keller to clear the
people playing dominoes out from the courtyard. 
As appellant made this demand, Keller could see that appellant was
holding a gun, and he heard appellant cock the gun.  After appellant went into the complex, Keller
was returning to their car when he heard gunshots.  Keller, appellant, and their two friends
immediately left Southmore Gardens.  When appellant got into the car, he told
Keller that “[i]t was him or me” and that “the dude
had threatened his life.”

Houston Police Department Officer
J. Pena testified that he took photographs of Ford’s apartment and recovered
physical evidence.  He stated that when
he arrived at the scene he saw Ford lying face-down on the living room floor and
partially on top of his cane, which had a bullet hole in it.  Pena recovered ten spent bullet casings from
the living room of Ford’s apartment.  He
testified that he found some casings near the front door of the apartment and
some casings closer to Ford’s body, which was located further inside the living
room.  He stated that the relative
location of the casings was consistent with “somebody entering the front door,
walking in to the right and progressing into the apartment living room area.”

Dr. Pramod
Gumpeni, of the Harris County Medical Examiners’
Office, testified regarding the results of Ford’s autopsy.  Dr. Gumpeni
testified that Ford had eight perforating and penetrating gunshot wounds, one
graze wound, and blunt trauma to the head, which was consistent with Ford
hitting something as he fell to the ground after being shot.  Ford sustained injuries to, among other
organs and tissues, his ribs, diaphragm, liver, lungs, stomach, and aorta.  Dr. Gumpeni
testified that three of the gunshot wounds could have been fatal and that three
of the wounds entered Ford’s body from behind. 
He stated that the gunshot wound on Ford’s right leg had “pseudo
stippling” around it, indicating that the bullet had passed through another
object before hitting Ford.  He agreed
with the prosecutor that the stippling marks were consistent with the bullet
passing through Ford’s cane before striking his leg.

Appellant testified on his own
behalf.  He stated that at the time of Ford’s
murder he was on deferred adjudication for delivery of a controlled substance.[2]  He admitted that he had violated the terms of
his community supervision by failing to report and by testing positive for
marijuana use.  He testified that that
incident was the only other time in which he had been in trouble with the law.

Appellant stated that he usually
hung out at Southmore Gardens every day.  He knew Ford and testified that he had never
had any problems with him before this incident. 
Appellant witnessed Ford’s altercation with Nicks, but he did not say
anything to Ford about it.  According to
appellant, several minutes later, as he was about to leave Southmore
Gardens, Ford started a conversation with him about the incident with Nicks.  The conversation escalated into an argument,
and, during the argument, Ford went into his apartment, returned with a knife
or machete, and started “making threats with it.”  Appellant stated that he did not see the
weapon at first and that someone else pointed it out to him when he started to
approach Ford.  Appellant testified that
he felt a little nervous and scared and that he then got in a friend’s car and
left Southmore Gardens.

          Appellant
testified that he felt “played” and “disrespected” after this altercation with
Ford, and, because he went over to Southmore Gardens
every day, he felt that he needed to “protect [himself]” against any future
incidents.  When he arrived at his house,
he picked up a gun and went back to Southmore Gardens
to “resolve the matter” with Ford.  He
testified that he had no intention of harming Ford; rather, he wanted to settle
their disagreement “so [he would not] have to be looking over [his] shoulder
every time [he went] over there.”  He
stated that he believed he needed the gun because Ford had already threatened
him with a weapon earlier in the evening and he therefore needed protection.

          Appellant
admitted that he and his friends smoked some marijuana when they arrived back
at Southmore Gardens and that he told one of his
friends to clear the courtyard before he went to Ford’s apartment.  He testified that the front door to Ford’s
apartment was open, although the screen door was closed, and that he saw Ford
sitting down in a chair as he approached. 
When he announced his presence, Ford told him to come into the
apartment.  According to appellant, when
he opened the screen door, he saw Ford reach for something, and because it was
dark in the apartment and he did not know what Ford was reaching for, he “just
fired and ran.”  Appellant believed that
Ford was reaching for the machete that he had had outside with him during their
earlier confrontation.  He could not
recall how many times he fired the gun, but he testified that he was “firing
and moving” out of the apartment.[3]  He admitted that he told Keller to make sure
everyone was out of the courtyard “[b]ecause he [did
not] know what was fixing to escalate” and that he held the gun in his hand as
he walked up to Ford’s apartment.

          Several
of appellants’ relatives testified on his behalf.  They each testified that they have never
known appellant to be a violent person, that he was generally peaceful and
law-abiding, and that this incident was completely out of character for appellant.  Appellant’s mother testified that he had
never been in trouble with the law before he moved to Houston from Louisiana,
and she attributed his legal troubles to “bad company.”

          The
trial court assessed appellant’s punishment at thirty years’ confinement.  Appellant did not object or state any reason
why this sentence should not be pronounced. 
He did not file a motion for new trial arguing that his sentence was
disproportionate to the offense and, thus, cruel and unusual.

Cruel and Unusual Punishment

          In
his sole issue, appellant contends that his thirty-year sentence is
disproportionate to the offense and, therefore, constitutes cruel and unusual
punishment.  The State responds that
appellant failed to preserve this contention for appellate review because he
did not object to the sentence either at the time it was assessed or in a
motion for new trial.  The State also
contends that appellant’s issue is meritless because the sentence was within
the statutory limitations for the offense of murder, and appellant has not
demonstrated that the sentence is grossly disproportionate to the offense.  We agree with the State.

          A.      Preservation

          The
Eighth Amendment to the United States Constitution requires that a criminal
sentence be proportionate to the crime for which a defendant has been
convicted.  See Solem v. Helm, 463 U.S. 277, 290, 103
S. Ct. 3001, 3009 (1983); Noland v. State,
264 S.W.3d 144, 151 (Tex. App.—Houston [1st Dist.] 2007, pet. ref’d).  However, as
a prerequisite for presenting a complaint for appellate review, including a
complaint that a particular sentence constitutes cruel and unusual punishment, the
complaining party must make a timely request, objection, or motion that states
the grounds for the ruling sought from the trial court with sufficient
specificity to make the trial court aware of the complaint.  See
Tex. R. App. P. 33.1(a)(1)(A); Noland, 264 S.W.3d at 151; see also Ham v. State, 355 S.W.3d 819,
825 (Tex. App.—Amarillo 2011, pet. ref’d)
(“Constitutional rights, including the right to be free from cruel and unusual
punishment, can be forfeited by a failure to raise a complaint on specific
constitutional grounds in the trial court.”); Wynn v. State, 219 S.W.3d 54, 61 (Tex. App.—Houston [1st Dist.]
2006, no pet.) (“The record does not indicate that appellant objected at trial
to the sentence of life imprisonment. 
Nor did he raise these arguments in a motion for new trial.  Failing to object in the trial court to an
alleged disproportionate sentence waives any error.”).

          Appellant
acknowledges that he did not object on cruel and unusual punishment grounds at
the time the trial court assessed his sentence. 
Furthermore, the record reflects that he did not file a motion for new
trial complaining that his sentence was disproportionate and constituted cruel
and unusual punishment.  We therefore
conclude that appellant has failed to preserve his contention that his
thirty-year sentence constitutes cruel and unusual punishment.

 

 

          B.      Proportionality

Even if we were to address the
merits of appellant’s sole issue, we would conclude that his thirty-year
sentence is not disproportionate to the offense and, therefore, does not
constitute cruel and unusual punishment.

          The
sentencing authority has “essentially ‘unfettered’” discretion to impose any
punishment within the prescribed statutory range.  See Ex
parte Chavez, 213 S.W.3d 320, 323 (Tex. Crim. App. 2006) (quoting Miller-El v. State, 782 S.W.2d 892, 895
(Tex. Crim. App. 1990)).  Generally,
punishment assessed within the statutory limits for the particular offense is
not excessive, cruel, or unusual punishment. 
Dale v. State,
170 S.W.3d 797, 799 (Tex. App.—Fort Worth 2005, no pet.).  “A narrow exception to the general rule that
a sentence within the statutory limits is not excessive, cruel, or unusual is
recognized when the sentence is grossly disproportionate to the offense.”  Id.

We analyze an Eighth Amendment
challenge “by reviewing the proportionality of the sentence compared to the
crime.”  Arriaga v. State, 335 S.W.3d 331, 335 (Tex. App.—Houston [14th Dist.]
2010, pet. ref’d) (citing Graham v. Florida, 130 S. Ct. 2011, 2022 (2010)).  In this analysis, we consider (1) the gravity
of the offense and the harshness of the penalty; (2) the sentences imposed on
other criminals in the same jurisdiction; and (3) the sentences imposed for the
commission of the same offense in other jurisdictions.[4]  Id.;
Dale, 170 S.W.3d at
799.  First, we make a “threshold
comparison of the gravity of the offense against the severity of the sentence”
by “judg[ing] the gravity
of the offense in light of the harm caused or threatened to the victim or
society and the culpability of the offender.” 
Dale, 170 S.W.3d at 800; see also Ham, 355 S.W.3d at 825–26 (“In
the context of proportionality challenges, the United States Supreme Court has
noted that the severity and irrevocability of murder distinguishes it from
other crimes.”) (citing Graham, 130 S. Ct. at 2027). 
Only if we determine that the sentence is grossly disproportionate to
the offense do we consider the two remaining factors.  See Arriaga, 335 S.W.3d at 335; Dale, 170 S.W.3d at 800; see
also Ham, 355 S.W.3d at 826 (“The precise contours of the ‘grossly
disproportionate’ standard are unclear, but it applies in only ‘exceedingly
rare’ and ‘extreme’ cases.  ‘The gross
disproportionality principle reserves a constitutional violation for only the
extraordinary case.’”) (quoting Lockyer v. Andrade, 538 U.S. 63, 73, 77, 123 S. Ct. 1166, 1173, 1175
(2003)).

          Appellant
contends that the sentence is disproportionate to the offense because (1)
although he had previously been placed on deferred adjudication for delivery of
a controlled substance, he has no history of committing violent crimes; (2)
there is no indication that appellant had committed any other bad acts before
this incident; (3) he “armed himself” only because Ford had “armed himself
earlier that evening”; and (4) he did not intend to harm Ford when he arrived
at Ford’s apartment, but instead only intended to resolve his earlier
disagreement with Ford.

          Here,
appellant pleaded guilty before the jury to the first degree felony offense of
murder.  See Tex. Penal Code Ann.
§§ 19.02(b)(1)–(2), (c) (Vernon 2011).  The applicable statutory punishment range was
five to ninety-nine years’ confinement or confinement for life, plus a fine of
up to $10,000.  Id. § 12.32 (Vernon 2011).  The trial court in this case assessed
punishment at thirty years’ confinement. 
Appellant’s sentence falls within the permissible statutory punishment
range; indeed, considering that the punishment range is from five years to
life, appellant’s sentence of thirty years falls within the lower end of the
punishment range.[5]

          Appellant
pleaded guilty to murdering Ford, and he conceded during his testimony that
this was not an appropriate case to raise the theory of self-defense.  Appellant contends that he did not intend to
harm Ford when he arrived at his apartment and that he merely wished to resolve
their earlier disagreement.  He testified,
however, that he had his friends clear other people out of the Southmore Gardens courtyard “[b]ecause
he [did not] know what was fixing to escalate” and that he approached Ford’s
apartment with the gun in his hand.  Two
witnesses recalled appellant cocking the gun before walking to Ford’s
apartment.  Although appellant could not
recall how many times he fired the gun while in Ford’s apartment, Dr. Gumpeni testified that Ford had eight “perforating and
penetrating” gunshot wounds and one graze wound.  Dr. Gumpeni
testified that several major organs were damaged, that at least three of the
gunshot wounds could have been fatal, and that three of the gunshot wounds
entered Ford’s body from behind.

          Officer
Pena testified that Ford was discovered lying face-down on the floor of his
living room and lying partially on top of his cane, which had a bullet hole in
it.  Officer Pena recovered ten spent
bullet casings from Ford’s apartment.  The
casings were located in different areas of the apartment, with some closer to
the front door and some closer to Ford’s body. 
He testified that the location of the spent casings was consistent with
the shooter’s entering the apartment and “progressing into the apartment living
room area.”[6]  No weapon was found near Ford’s body or the
chair in which he had been sitting when appellant arrived.

          Although
appellant has no history of committing violent crimes, he did acknowledge that he
had a weapon in his possession when he was previously arrested for delivery of
a controlled substance.  He also
testified that he had sold cocaine on multiple occasions and that he had
violated the terms of his deferred adjudication by failing to report and by
using marijuana.

          The
record reflects that appellant violently murdered an unarmed man who was no
immediate threat to him by shooting him eight times.  He received a sentence of thirty years, which
falls within the lower end of the punishment range for murder.  We conclude that, based on this record,
appellant’s sentence is not unconstitutionally disproportionate to the offense
of murder and, thus, does not constitute cruel and unusual punishment.

          We
overrule appellant’s sole issue.




 

Conclusion

          We
affirm the judgment of the trial court.

 

 

                                                                   Evelyn
V. Keyes

                                                                   Justice


 

Panel
consists of Justices Keyes, Bland, and Sharp.

Do
Not Publish.  Tex. R. App. P. 47.2(b).











[1]           See
Tex. Penal Code Ann.
§ 19.02(b)(1)–(2) (Vernon 2011).





[2]           On cross-examination, appellant
admitted that he had a gun in his possession when he was arrested for delivery
of a controlled substance.





[3]           On cross-examination, appellant stated
that he “[n]ever came into the apartment.”





[4]           We note that even if appellant had
preserved this contention for appellate review, “there is no evidence in the
record comparing the sentences imposed on persons in Texas with sentences
imposed against defendants in other jurisdictions who committed a similar
offense.”  Guin v. State, 209 S.W.3d
682, 687–88 (Tex. App.—Texarkana 2006, no pet.).





[5]           To the extent appellant contends that
his sentence violates the Texas Constitution, we note, “It has long been
recognized that if the punishment assessed is within the range of punishment
established by the Legislature under its constitutional authority, there is no
violation of the state constitutional provisions against cruel and unusual
punishment. . . .  Neither by argument nor authority
has appellant established that the provisions of the Texas Constitution offer
broader or greater protection than the Eighth Amendment . . . .”  Baldridge v. State,
77 S.W.3d 890, 893–94 (Tex. App.—Houston [14th Dist.] 2002, pet. ref’d) (citing Puga v. State, 916
S.W.2d 547, 550 (Tex. App.—San Antonio 1996, no pet.)).





[6]           Appellant testified
inconsistently.  He testified that he did
not actually enter Ford’s apartment, but, instead, he stayed in the
doorway.  He also testified, however,
that when he saw Ford reach for something, he started “firing and moving” out
of the apartment.